**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CORY A. RESH, | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | |
| | : | **No. 16-CV-2437(CMR)** |
| v. | : | |
| | : | |
| JODY BORTNER; and | : | |
| 3FX, INC. | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

AND NOW, this _____ day of _____, 2016, upon consideration

of Plaintiff's Petition for Appointment of a Receiver *Pendente Lite*, and Defendants' response

thereto, good cause appearing, it is hereby ORDERED and DECREED that said Petition is

GRANTED.

It is further ORDERED that:

1.      Except as necessary to implement the terms of this Order, defendant Jody

Bortner is hereby enjoined from taking any action on behalf of 3FX, Inc., as an officer or director

of the corporation.

2.      The Court shall appoint a receiver *pendente lite* to conduct the financial

affairs of 3FX, Inc. pending the outcome of this case on the merits. Within three (3) days of the

date hereof, the parties shall submit to the court the names and curriculum vitae of all proposed

receivers. The Court shall select a receiver *pendente lite* to be compensated by 3FX, Inc.,

whereupon the parties shall cooperate in the orderly transition of authority to the receiver

*pendente lite* and provide access to the books and records of 3FX, Inc. necessary for the

performance of the receiver *pendente lite's* duties.

BY THE COURT:

_____
, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CORY A. RESH, | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| v. | : | **No. 16-cv-2437(CMR)** |
| | : | |
| JODY BORTNER; and | : | |
| 3FX, INC. | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

## PLAINTIFF'S PETITION FOR APPOINTMENT OF A RECEIVER *PENDENTE LITE*

Plaintiff, Cory A. Resh ("Resh"), by and through undersigned counsel, hereby petitions this Honorable Court for the appointment of a receiver *pendente lite*, and in support thereof avers as follows:

1.      As set forth in detail in the Affidavit of Resh attached hereto as Exhibit A, defendant Jody Bortner ("Bortner") has breached her fiduciary obligation to Resh by freezing him out of the corporation that they co-own and founded, defendant 3FX, Inc. ("3FX"). Resh has filed a Complaint seeking, *inter alia*, dissolution of the corporation, and the appointment of a liquidating receiver. A true and correct copy of said Complaint is attached hereto as Exhibit B. To preserve the status quo until such time as the case can be decided on its merits, Resh requests this Honorable Court to appoint a receiver *pendente lite* to secure the financial condition of 3FX pending the outcome of the parties' dispute on the merits.

2.      In 1995, Resh, Bortner and Greg O'Driscoll ("O'Driscoll") decided to go into a 3D animation business together as equal partners. They incorporated 3FX, with each of the three principals owning one-third of the shares of stock and constituting the officers and directors of

the corporation.

3.     When the business was started, Resh already had 14 years of experience as a 3D animation artist and had won an Emmy award. Bortner was a 2D artist without significant experience in 3D animation. O'Driscoll had experience in sales and marketing.

4.     Approximately one year after the business commenced, Resh and Bortner purchased O'Driscoll's shares in the business, whereupon and continuing to this day, Resh and Bortner have been equal 50% shareholders of 3FX, as well as the only officers and directors of the corporation.

5.     As equal owners of 3FX, until the events giving rise to this lawsuit, Resh and Bortner have been required to work together and in consultation on all matters of importance to the corporation, and to reach a consensus about how to proceed in the best interests of the corporation.

6.     After hiring and training production staff with 3D animation experience, in or about 2001, Resh's job duties were transitioned to Sales and Marketing. Bortner was a Project Manager and she took care of the day to day operations of the business.

7.      The business of 3FX continued to grow, and in 2005, it hired the first of several Sales Representatives. At that point, Resh's role in the business was managing and working with the Sales Representatives to find new business and increase the revenue of 3FX. He was responsible for contacting and meeting with potential clients, presenting 3FX's capabilities, creating written project proposals, and furthering 3FX's offerings to clients through collaborations with outside vendors. Resh also produced print and electronic marketing materials, the company website, demo reels, etc.

8.    Bortner's role continued to be as a Project Manager and to oversee daily operations of the company.

9.    As equal owners of 3FX, Resh and Bortner received equal compensation from the corporation.

10.    In the beginning of 2013, Bortner approached Resh and told him that, despite the fact that he had been in charge of all sales, marketing, and business development for the previous 12 years, she believed she could do a better job of increasing business revenue for 3FX.

11.    After that conversation, Bortner began to do things "her way" and often without consulting Resh about important matters affecting the business of 3FX.

12.    For example, in May 2013, Bortner hired Neil Gottlieb ("Gottlieb") as Vice President of Sales, Marketing & Business Strategy. Bortner conducted the hiring process to the exclusion of Resh and never allowed him to meet or interview the candidates. Following her hiring decision, Bortner also determined, without Resh's input or approval, to pay Gottlieb $135,000 per year, plus a 10% commission on all projects awarded to him. 3FX's previous sales representatives had been paid base salaries of $50,000 per year. As a result of Bortner's unilateral decision, Gottlieb now earns more compensation from 3FX than even the owners.

13.    Subsequent to her unilateral hiring of Gottlieb, Bortner started to work very closely with him, and together they made a concerted effort to ignore Resh and to exclude him from important business matters.

14.    For example, Bortner and Gottlieb conducted meetings regarding the direction of the company's sales and marketing efforts. Resh was not invited to attend these meetings, nor was he made aware that they were occurring at the time. The existing strategies that had been

3

implemented by Resh along with another Sales Representative were dismissed and ignored by Bortner.

15.     Frustrated by the lack of respect shown to him by Bortner, in July 2013, the other Sales Representative abruptly resigned his position with 3FX, which resulted in a substantial loss of revenue for the business.

16.     Resh spent the remainder of the 2013 insisting the Bortner include him in all discussions regarding sales and marketing. Bortner denied Resh at every turn. She was adamant that her decisions were the best for the company, and that Resh's decisions, thoughts and ideas were of no use. She began to run 3FX as if she were the majority controlling shareholder of the corporation and Resh were a minority owner whose vote was less valuable than hers.

17.     While it was evident that it would be difficult, if not impossible, to repair their working relationship as co-owners of 3FX, Bortner and Resh were able to reach a consensus that it would be best for her to purchase Resh's shares of the corporation. To this end, in 2013, they began to negotiate regarding the price and terms of a buyout of his interest in the corporation. However, although negotiations continued for an extended period, they were unable to reach an agreement.

18.     In 2014, Bortner's conduct toward Resh became even more brazen, open and adversarial. She ignored his input as an owner, officer and director of the corporation for the entirety of 2014. At the employee Christmas party that year, Bortner made a speech to the employees which completely excluded Resh in all manner. This made it clear to the entire staff of 3FX that Bortner was acting as the controlling owner, and that she had no regard for Resh.

19.     In January 2015, upon Resh's continued objection to her excluding him from the

4

corporation's affairs and important business decisions, Bortner and Resh agreed to work toward finalizing a buy-out of his shares by the end of 2015.

20.     In August 2015, Resh accepted Bortner's offer of $1,000,000 for the purchase of his shares over a 4-year term. However, they were unable to finalize the terms of the buyout because, *inter alia*, Bortner was unwilling to guaranty the payments. She wanted to own 100% of the corporation's shares, but she was not willing to pay for them, except from the profits of the corporation, if profits were available. Thereafter, Bortner withdrew her offer to purchase Resh's shares entirely.

21.     Nevertheless, and despite the fact the buyout negotiations were terminated by Bortner, she has continued to run the corporation as its controlling shareholder, excluding Resh from all decisions and ignoring his objections to her unilateral decisions.

22.     In June 2015, Bortner unilaterally reduced Resh's annual salary from $100,000 to $25,000.

23.     Subsequently, Bortner has excluded Resh from all decisions regarding hiring, employee salaries, capital expenses, etc.

24.     Moreover, Bortner has prevented Resh having access to the corporation's financial records. Despite his requests, he has not received financial reports since October 2015. He was not consulted with regard to the year-end bonus/distribution decisions that he and Bortner had typically made together at year's end since 1995. Bortner is simply determined to run the company her way, with absolutely no regard for Resh's rights as a 50% owner, officer and director.

25.     In the 2-1/2 years that Bortner has run the company her way and to the exclusion

5

of Resh, 3FX has seen no significant increase in revenues. However, there have been substantial increases in unwarranted overhead expenses.

26.     3FX is no longer being run efficiently or cost effectively.

27.     Prior to Resh having been frozen out of the corporation by Bortner, the fair market value of 3FX was in excess of $2,000,000.

28.     As a result of Bortner's unilateral and poor decisions, self-dealing and mismanagement, the current value of 3FX has likely dropped substantially.

29.     Bortner has breached her fiduciary duty to Resh by freezing him out of the corporation and oppressing his rights as a shareholder of 3FX.

30.     The breaches of fiduciary duty by Bortner and freeze out of has included, *inter alia*, the following:

        a.     Bortner has increased her annual salary from $100,000 to $150,000 while decreasing Resh's salary from $100,000 to $25,000.

        b.     In 2013, Bortner unilaterally provided three (3) top employees 40% increases in salary.

        c.     Bortner scheduled a meeting with a client, Hoffmann La-Roche, in Basil, Switzerland to introduce Gottlieb as the client's new 3FX contact. Bortner brought her husband and young daughter with her on that trip. All four of them flew first class and stayed at an expensive hotel on funds advanced by 3FX. Bortner told Resh that these expenses would be reimbursed to 3FX by the client. However, when the expense report was submitted to the client, it refused reimbursement because the costs were unwarranted and excessive.

6

     d.     Bortner unilaterally agreed to pay Gottlieb a 10% commission of Hoffmann-La Roche projects even though that account pre-dated his hiring.

     e.     In 2014, Bortner and Gottlieb hired Debbie Cauterucci as a Sales Representative at an annual salary of $85,000. She lasted only 6 months, during which she obtained only a single, small value project.

     f.     Bortner engaged a personal friend, Dawn Sedgwick, as a freelance Project Manager and paid her approximately $20,000 to perform services that could have been done in-house at a greatly reduced cost.

     g.     Bortner hired Vendere Partners as an outside sales company. This decision cost 3FX $33,000, but resulted in no business.

     h.     Bortner used 3FX funds, to pay invoices from her personal attorney who had attempted to negotiate Bortner's buyout of Resh's shares.

     i.     Bortner has used the company Citibank card to buy family groceries, lunches, technology devices, and educational purchases for her daughter.

     j.     In 2015, Bortner had the corporate checking account changed to require her signature only. Resh no longer has access to the corporation's checking account.

     k.     The use of freelancers to assist in projects has increased in 2015, even though 3FX's billings are reduced and the in-house staff is capable of producing the work without outside assistance.

     l.     3FX's travel expenses have increased dramatically beginning in 2014 and much of the travel is unnecessary.

      m.     Resh had always been provided financial reports on a bi-weekly basis when 3FX's bookkeeper was in the office. Following the cancellation of the buyout negotiations by Bortner, she directed that Resh stop being provided those reports. Despite demand, he has not received bi-weekly financial reports since October, 2015.

      n.     Historically, Bortner and Resh would agree upon the appropriate year-end distribution to shareholders by Dec. 31st. However, in 2015 Bortner unilaterally determined that there would be no year-end distribution to the shareholders for the first time in 3FX's history. Effective as of January 1, 2016, she gave herself a substantial pay raise.

      o.     For 2016, Bortner has added $152,000 in additional corporate salary expense.

      p.     Bortner has prepared an operating budget for 2016 which estimates that there will be no profits available for distribution at year's end. To date, 3FX is far behind its budgeted revenue estimates for 2016.

      q.     Resh has not been provided with 3FX's year-end 2015 Financial Statements.

      r.     On the 2015 Federal tax return, Form 1125-E Compensation of Officers, Resh's name was omitted and Bortner is listed as the only corporate officer.

      s.     On or around March 2015, Resh's remote access the company servers was removed.

    31.    Pursuant to 15 Pa.C.S. § 1767, a court may appoint a custodian for a corporation upon application of a shareholder when, ". . . the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5 percent or more of the outstanding shares of any class of the corporation in their capacities as

shareholders, directors, officers or employees."

32.     Because 3FX, Inc. has only two shareholders, Resh and Bortner, it qualifies as a closely held corporation. Resh owns 50% of the outstanding shares of 3FX, Inc. and he is a director of the corporation. Thus, under 15 Pa.C.S. §1767, he has standing to request this Court to appoint of a custodian to protect his rights from the oppressive conduct of Bortner.

33.     The Business Corporation Law specifically empowers this Court to issue a preliminary injunction to preserve the status quo and to prevent unlawful and oppressive conduct by corporate fiduciaries. 15 Pa.C.S. §1984 provides that, ". . . the court may issue injunctions, appoint a receiver *pendente lite* with such powers and duties as the court from time to time may direct and proceed as may be requisite to preserve the corporate assets wherever situated and to carry on the business of the corporation until a full hearing can be had."

34.     The conduct of Defendants Bortner, as fully detailed in the Affidavit of Resh is oppressive.

35.     To preserve the status quo, this Honorable Court must appoint a receiver *pendente lite* to safeguard the financial affairs of 3FX, Inc. until such time as the parties' dispute can be determined on its merits.

WHEREFORE, Plaintiff Cory A. Resh respectfully requests this Honorable Court to grant his Petition for Preliminary Injunction and to enter a Preliminary Injunction in the form proposed.

Date: May 19, 2016                     /s/ Stanley B. Cheiken, Esquire (SC1060)
                                        STANLEY B. CHEIKEN, ESQUIRE

                                        *Attorney for Plaintiff Cory A. Resh*

9

# EXHIBIT A

## AFFIDAVIT OF CORY A. RESH

I, Cory A. Resh, being duly sworn, do hereby depose and say as follows:

1.      I am an adult individual and I am taking this Affidavit based upon my personal knowledge and in support of the Petition for Appointment of a Receiver *Pendente Lite*.

2.      In 1995, Jody Bortner ("Bortner"), Greg O'Driscoll ("O'Driscoll") and I decided to go into a 3D animation business together as equal partners.

3.      On September 29, 1995, 3FX, Inc. ("3FX") was incorporated in Pennsylvania, with each of the three principals owning one-third of the shares of stock and constituting the officers and directors of the corporation.

4.      When we started the business, I already had 14 years of experience as a 3D animation artist, and I had won an Emmy award. Bortner was a 2D artist without significant experience in 3D animation. O'Driscoll had experience in sales and marketing.

5.      Approximately one year after the business commenced, Bortner and I purchased O'Driscoll's shares in the business, whereupon and continuing to this day, Bortner and I have been equal 50% shareholders of 3FX, as well as the only officers and directors of the corporation.

6.      As equal owners of 3FX, until the events giving rise to this lawsuit, Bortner and I were required to work together and in consultation on all matters of importance to the corporation, and to reach a consensus about how to proceed in the best interests of the corporation.

7.      After hiring and training production staff with 3D animation experience, in or about 2001, my job duties were transitioned to Sales and Marketing. Bortner was a Project Manager and she took care of the day to day operations of the business.

8. The business of 3FX continued to grow, and in 2005, we hired our first of several Sales Representatives. At that point, my role in the business was managing and working with the Sales Representatives to find new business and increase the revenue of 3FX. To that end, I was responsible for contacting and meeting with potential clients, presenting our capabilities, creating written project proposals, and furthering 3FX's offerings to clients through collaborations with outside vendors. I also produced print and electronic marketing materials, the company website, demo reels, etc.

9. Jody Bortner's role continued to be as a Project Manager and to oversee daily operations of the company.

10. Until the events giving rise to this lawsuit, as equal owners of 3FX, at all times, Bortner and I received equal compensation from the corporation.

11. In the beginning of 2013, Bortner approached me and told me that, despite the fact that I had been in charge of all sales, marketing, and business development for the previous 12 years, she believed she could do a better job of increasing business revenue for 3FX.

12. After that conversation, Bortner began to do things "her way" and often without consulting me about important matters affecting the business of 3FX.

13. For example, in May 2013, Bortner hired Neil Gottlieb as Vice President of Sales, Marketing & Business Strategy. Bortner conducted the hiring process to my exclusion, never allowing me to meet or interview the candidates. Following her hiring decision, Bortner also determined, without my input or approval, to pay Mr. Gottlieb $135,000 per year, plus a 10% commission on all projects awarded to him. Our previous sales representatives had been paid base salaries of $50,000 per year. As a result of Bortner's unilateral decision, Mr. Gottlieb now earns more compensation from 3FX than even the owners.

2

14.    Subsequent to her unilateral hiring of Mr. Gottlieb, Bortner started to work very closely with him, and together they made a concerted effort to ignore me and to exclude me from important business matters.

15.    For example, Bortner and Mr. Gottlieb conducted meetings regarding the direction of the company's sales and marketing efforts. I was not invited to attend these meetings, nor was I made aware that they were occurring at the time. The existing strategies that had been implemented by another Sales Representative and me were dismissed and ignored by Bortner.

16.    Frustrated by the lack of respect shown to him by Bortner, in July 2013, the other Sales Representative abruptly resigned his position with 3FX, which resulted in a substantial loss of revenue for the business.

17.    I spent the remainder of the 2013, insisting that Bortner include me in all discussions regarding sales and marketing. Bortner denied me at every turn. She was adamant that her decisions were the best for the company, and that my decisions, thoughts and ideas were of no use. She began to run 3FX as if she were the majority controlling shareholder of the corporation and I was a minority owner whose vote was less valuable than hers.

18.    While it was evident that it would be difficult, if not impossible, to repair our working relationship as co-owners of 3FX, Bortner and I were able to reach a consensus that it would be best for her to purchase my shares of the corporation. To this end, in 2013, we began to negotiate regarding the price and terms of a buyout of my interest in the corporation. However, although negotiations continued for an extended period, we were unable to reach an agreement.

19.    In 2014, Bortner's conduct toward me became even more brazen, open and adversarial. She ignored my input as an owner, officer and director of the corporation for the

3

entirety of 2014. At the employee Christmas party that year, Bortner made a speech to the employees which completely excluded me in all manner. This made it clear to the entire staff of 3FX that Bortner was acting as the controlling owner, and that she had no regard for me.

20.    In January 2015, upon my continued objection to her excluding me from the corporation's affairs and important business decisions, Bortner and I agreed that we would work toward finalizing a buy-out of my shares by the end of 2015.

21.    In preparation for the buy-out, I moved to Florida and made it my primary residency.

22.    In August 2015, I accepted Bortner's offer of $1,000,000 for the purchase of my shares over a 4-year term. However, we were unable to finalize the terms of the buyout because, *inter alia*, Bortner was unwilling to guaranty the payments. She wanted to own 100% of the corporation's shares, but she was not willing to pay for them, except from the profits of the corporation, if profits were available. Thereafter, Bortner withdrew her offer to purchase my shares entirely.

23.    Nevertheless, and despite the fact the buyout negotiations were terminated by Bortner, she has continued to run the corporation as its controlling shareholder, excluding me from all decisions and ignoring my objections to her unilateral decisions.

24.    In June 2015, Bortner unilaterally reduced my annual salary from $100,000 to $25,000.

25.    Subsequently, Bortner has excluded me from all decisions regarding hiring, employee salaries, capital expenses, etc.

26.    Moreover, Bortner has prevented me having access to the corporation's financial records. I have not received financial reports since October 2015, even though I have requested

4

them. I was not provided year-end 2015 financial information until Jan. 7, 2016. I was not

consulted with regard to the year-end bonus/distribution decisions that we had typically made

together at year's end since 1995. Bortner was simply determined to run the company her way,

with absolutely no regard for my rights as a 50% owner, officer and director.

27.     In the 2-1/2 years that Bortner has run the company her way and to my exclusion,

3FX has seen no significant increase in revenues. However, there have been substantial increases

in unwarranted overhead expenses.

28.     It is my contention that the company is no longer being run efficiently or cost

effectively. Revenues are up slightly, but profitability is down.

29.     The fair market value of 3FX as of the date I was frozen out of the corporation

was in excess of $2,000,000. But as a result of Bortner's unilateral and poor decisions, self-

dealing and mismanagement, the current value of the corporation has likely dropped

substantially.

30.     The following is a list of items that were either done without my knowledge

and/or against my stated wishes and concerns.

        a.      Bortner has increased her annual salary from $100,000 to $150,000.

        b.      In 2013, Bortner provided three (3) top employees 40% increases in

salary.

        c.      I landed Hoffmann La-Roche as a key client in 2012. Bortner scheduled a

meeting with the client in Basil, Switzerland to introduce Mr. Gottlieb as the client's new 3FX

contact. Bortner brought her husband and young daughter with her on that trip. All four of them

flew first class and stayed at an expensive hotel on funds advanced by 3FX. When I learned of

this, I complained to Bortner. She told me that these expenses would be reimbursed to 3FX by

5

the client. However, and quite predictably, when the expense report was submitted to the client, it refused reimbursement saying the costs were unwarranted and excessive.

      d.     Bortner has agreed to pay Mr. Gottlieb a 10% commission of Hoffmann-La Roche projects even though that account pre-dated his hiring.

      e.     In 2014, Bortner and Mr. Gottlieb hired Debbie Cauterucci as a Sales Representative at an annual salary of $85,000. She lasted only 6 months, during which she obtained only a single, small value project.

      f.     Bortner engaged a personal friend, Dawn Sedgwick, as a freelance Project Manager and paid her approximately $20,000 to perform services that could have been done in-house at a greatly reduced cost.

      g.     Bortner hired Vendere Partners as an outside sales company. This decision cost 3FX $33,000, but resulted in no business, until Bortner terminated the relationship.

      h.     In 2015, 3FX needed to hire a replacement Project Manager. The replacement salary, as determined by Bortner, was $70,000 – plus a $5,000 increase in Jan. 2016.

      i.     Bortner has caused 3FX to spend approximately $5,000 for ad space in the *Medical SourceBoook Illustrators Guide* despite the fact that 3FX's prior participation in this publication has resulted in no project inquiries.

      j.     In 2013, Bortner decided that purchasing a booth-space at the 3-day Digital Pharma East trade show would yield additional clients and revenue. 3FX also attended in 2014 and 2015, at a cost of approximately $20,000 each time. In 2015, 3FX is listed as a Sponsor, costing an additional unknown amount. To date, I am unaware of a single project being awarded from any of the 3-years of attending that trade show.

      k.     Bortner used 3FX funds, to pay invoices from her attorney who had

attempted to negotiate a buyout of my shares.

l.    Bortner has used the company Citibank card to buy family groceries, lunches, technology devices, and educational purchases for her daughter. When questioned about the charges, she called it a mistake, as her personal and company cards "are the same color."

m.    In 2015, Bortner had the corporate checking account changed to require her signature only. I do not know if I remain a signatory, although it would not matter because I do not have access to any checks.

n.    The use of freelancers to assist in projects has increased in 2015, even though our billings are reduced. My opinion is that our in-house staff is fully capable of producing our work without outside assistance.

o.    3FX's travel expenses have increased dramatically beginning in 2014 and much of the travel is unnecessary.

p.    I had always been provided financial reports on a bi-weekly basis when our bookkeeper was in the office. Following the cancellation of the buyout negotiations, these reports have been stopped by Bortner. I have continued to demand them, only to be ignored, or provided with minimal information. I have received no bi-weekly financial reports since October, 2015.

q.    Historically, Bortner and I would agree upon the appropriate year-end distribution to shareholders by Dec. 31st. However, in 2015, I was provided with no financial information, and Bortner unilaterally determined that there would be no year-end distribution to the shareholders for the first time in 3FX's history. Effective January 1, 2016, however, Bortner gave herself a salary increase.

r.    For 2016, Bortner has added $152,000 in additional corporate salary

7

expense.

        s.      Bortner has prepared an operating budget for 2016 which estimates that there will be no profits available for distribution at year's end.  Even more troubling, is that, based on the budgeted need to earn $166,666 per month, 3FX is far behind its estimate revenue for 2016.

        t.      At our Q1 Board Meeting held on April 13, 2016, I found that both Bortner and our bookkeeper had referred to bound copies of our year-end 2015 Financial Statements. They were obviously delivered to the office by 3FX's accountant. However, I have not received copies of anything but 3FX's Federal tax return.

        u.      On the 2015 Federal tax return, Form 1125-E Compensation of Officers, my name was omitted and Bortner is listed as the only corporate officer.

        v.      On or around March 2015, I noticed that I could no longer remotely access any information within the company servers.  Prior to this, all information to all workstations and storage devices was available to me. I would use this to access marketing materials and video clips that had been requested by potential clients.

        Further affiant sayeth not.

CORY A. RESH

Sworn to and subscribed before
me this ____ day of May, 2016.

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MOLLY M HUNT
Notary Public
PENN TWP, YORK COUNTY
My Commission Expires

8

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MOLLY M HUNT
Notary Public
PENN TWP, YORK COUNTY
My Commission Expires Oct 30, 2019

# EXHIBIT B

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Cory A Resh

## DEFENDANTS
Jody Bortner and 3FX, Inc.

**(b)** County of Residence of First Listed Plaintiff    Osceola, Co., Florida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bucks
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stanley B. Cheiken
101 Greenwood Ave., Suite 400
Jenkintown, PA 19046, (215) 572-8600

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 340 Marine / ☐ 345 Marine Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Product Liability / ☒ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | Injury / ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| | ☐ 362 Personal Injury - / Product Liability | ☐ 791 Employee Retirement Income Security Act | | ☐ 896 Arbitration |
| **REAL PROPERTY** | Medical Malpractice / | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 220 Foreclosure | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 441 Voting / ☐ 463 Alien Detainee | | | |
| ☐ 240 Torts to Land | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 245 Tort Product Liability | ☐ 443 Housing/ / ☐ 530 General | | | |
| ☐ 290 All Other Real Property | Accommodations / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 445 Amer. w/Disabilities - / **Other:** | ☐ 462 Naturalization Application | | |
| | Employment / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 446 Amer. w/Disabilities - / ☐ 550 Civil Rights | | | |
| | Other / ☐ 555 Prison Condition | | | |
| | ☐ 448 Education / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332

Brief description of cause:
Shareholder Freezeout/Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 1,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 5/12/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _____3206 Slate Road, St. Cloud, FL 34772_____

Address of Defendant: _____4178 Milords Lane, Doylestown, PA 18902_____

Place of Accident, Incident or Transaction: _____Blue Bell, PA_____
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐  No☑

Does this case involve multidistrict litigation possibilities?    Yes☐  No☑
*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐  No☑

CIVIL: (Place in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, _____Stanley B. Cheiken, Esquire_____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: 5/12/16 _____        _____        62106
                          Attorney-at-Law                   Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 5/12/16 _____        _____        62106
                          Attorney-at-Law                   Attorney I.D.#

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

CORY A. RESH

        Plaintiff,

        v.

JODY BORTNER; AND
3FX, INC.

        Defendants.

**CIVIL ACTION**

**No.**

**JURY TRIAL DEMANDED**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     ( x )

5/12/16
**Date**

(215) 572-8600

**Telephone**

Stanley B. Cheiken

**Attorney-at-law**

(215) 572-7838

**Fax Number**

**Attorney for Plaintiff**

sbc@cheikenlaw.com

**Email Address**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CORY A. RESH,<br>3206 Slate Road<br>St. Cloud, Florida 34772, | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | **No.** |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| JODY BORTNER<br>4178 Milords Lane<br>Doylestown, Pennsylvania 18902, | : | |
| | : | |
| -AND- | : | |
| | : | |
| 3FX, INC.<br>751 Arbor Way, Suite 110<br>Blue Bell, Pennsylvania 19422 | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Cory A. Resh, by and through undersigned counsel, hereby brings this action against defendants Jody Bortner and 3FX, Inc., and avers as follows:

## PARTIES

1.     Plaintiff Cory A. Resh ("Resh") is an adult individual and a citizen of the State of Florida residing at 3206 Slate Road, St. Cloud, Florida 34772.

2.     Defendant Jody Bortner ("Bortner") is an adult individual and a citizen of the Commonwealth of Pennsylvania residing at 4178 Milords Lane, Doylestown, Pennsylvania 18902.

3.      Defendant 3FX, Inc. ("3FX") is a corporation organized an existing pursuant to the laws of the Commonwealth of Pennsylvania with its principal place of business located at 751 Arbor Way, Suite 110, Blue Bell, PA 19422.

## JURISDICTION AND VENUE

4.      Jurisdiction exists in this matter pursuant to 28 U.S.C. §§ 1332 and 1367, there existing complete diversity of citizenship among the parties and the amount of controversy exceeding the sum of $75,000 exclusive of interest and costs.

5.      Venue lies within this Judicial District pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to this lawsuit occurred herein.

## FACTUAL BACKGROUND

6.      In 1995, Resh, Bortner and Greg O'Driscoll ("O'Driscoll") decided to go into a 3D animation business together as equal partners.

7.      On September 29, 1995, they incorporated 3FX, with each of the three principals owning one-third of the shares of stock and constituting the officers and directors of the corporation.

8.      When the business was started, Resh already had 14 years of experience as a 3D animation artist and had won an Emmy award. Bortner was a 2D artist without significant experience in 3D animation. O'Driscoll had experience in sales and marketing.

9.      Approximately one year after the business commenced, Resh and Bortner purchased O'Driscoll's shares in the business, whereupon and continuing to this day, Resh and Bortner have been equal 50% shareholders of 3FX, as well as the only officers and directors of the corporation.

10.     As equal owners of 3FX, until the events giving rise to this lawsuit, Resh and

2

Bortner have been required to work together and in consultation on all matters of importance to the corporation, and to reach a consensus about how to proceed in the best interests of the corporation.

11.     After hiring and training production staff with 3D animation experience, in or about 2001, Resh's job duties were transitioned to Sales and Marketing. Bortner was a Project Manager and she took care of the day to day operations of the business.

12.     The business of 3FX continued to grow, and in 2005, it hired the first of several Sales Representatives. At that point, Resh's role in the business was managing and working with the Sales Representatives to find new business and increase the revenue of 3FX. He was responsible for contacting and meeting with potential clients, presenting 3FX's capabilities, creating written project proposals, and furthering 3FX's offerings to clients through collaborations with outside vendors. Resh also produced print and electronic marketing materials, the company website, demo reels, etc.

13.     Bortner's role continued to be as a Project Manager and to oversee daily operations of the company.

14.     As equal owners of 3FX, Resh and Bortner received equal compensation from the corporation.

15.     In the beginning of 2013, Bortner approached Resh and told him that, despite the fact that he had been in charge of all sales, marketing, and business development for the previous 12 years, she believed she could do a better job of increasing business revenue for 3FX.

16.     After that conversation, Bortner began to do things "her way" and often without consulting Resh about important matters affecting the business of 3FX.

17.     For example, in May 2013, Bortner hired Neil Gottlieb ("Gottlieb") as Vice

3

President of Sales, Marketing & Business Strategy. Bortner conducted the hiring process to the exclusion of Resh and never allowed him to meet or interview the candidates. Following her hiring decision, Bortner also determined, without Resh's input or approval, to pay Gottlieb $135,000 per year, plus a 10% commission on all projects awarded to him. 3FX's previous sales representatives had been paid base salaries of $50,000 per year. As a result of Bortner's unilateral decision, Gottlieb now earns more compensation from 3FX than even the owners.

18.     Subsequent to her unilateral hiring of Gottlieb, Bortner started to work very closely with him, and together they made a concerted effort to ignore Resh and to exclude him from important business matters.

19.     For example, Bortner and Gottlieb conducted meetings regarding the direction of the company's sales and marketing efforts. Resh was not invited to attend these meetings, nor was he made aware that they were occurring at the time. The existing strategies that had been implemented by Resh along with another Sales Representative were dismissed and ignored by Bortner.

20.     Frustrated by the lack of respect shown to him by Bortner, in July 2013, the other Sales Representative abruptly resigned his position with 3FX, which resulted in a substantial loss of revenue for the business.

21.     Resh spent the remainder of the 2013 insisting the Bortner include him in all discussions regarding sales and marketing. Bortner denied Resh at every turn. She was adamant that her decisions were the best for the company, and that Resh's decisions, thoughts and ideas were of no use. She began to run 3FX as if she were the majority controlling shareholder of the corporation and Resh were a minority owner whose vote was less valuable than hers.

22.     While it was evident that it would be difficult, if not impossible, to repair their

4

working relationship as co-owners of 3FX, Bortner and Resh were able to reach a consensus that it would be best for her to purchase Resh's shares of the corporation. To this end, in 2013, they began to negotiate regarding the price and terms of a buyout of his interest in the corporation. However, although negotiations continued for an extended period, they were unable to reach an agreement.

23.     In 2014, Bortner's conduct toward Resh became even more brazen, open and adversarial. She ignored his input as an owner, officer and director of the corporation for the entirety of 2014. At the employee Christmas party that year, Bortner made a speech to the employees which completely excluded Resh in all manner. This made it clear to the entire staff of 3FX that Bortner was acting as the controlling owner, and that she had no regard for Resh.

24.     In January 2015, upon Resh's continued objection to her excluding him from the corporation's affairs and important business decisions, Bortner and Resh agreed to work toward finalizing a buy-out of his shares by the end of 2015.

25.     In August 2015, Resh accepted Bortner's offer of $1,000,000 for the purchase of his shares over a 4-year term. However, they were unable to finalize the terms of the buyout because, *inter alia*, Bortner was unwilling to guaranty the payments. She wanted to own 100% of the corporation's shares, but she was not willing to pay for them, except from the profits of the corporation, if profits were available. Thereafter, Bortner withdrew her offer to purchase Resh's shares entirely.

26.     Nevertheless, and despite the fact the buyout negotiations were terminated by Bortner, she has continued to run the corporation as its controlling shareholder, excluding Resh from all decisions and ignoring his objections to her unilateral decisions.

27.     In June 2015, Bortner unilaterally reduced Resh's annual salary from $100,000 to

5

$25,000.

28.     Subsequently, Bortner has excluded Resh from all decisions regarding hiring, employee salaries, capital expenses, etc.

29.     Moreover, Bortner has prevented Resh having access to the corporation's financial records. Despite his requests, he has not received financial reports since October 2015. He was not consulted with regard to the year-end bonus/distribution decisions that he and Bortner had typically made together at year's end since 1995. Bortner is simply determined to run the company her way, with absolutely no regard for Resh's rights as a 50% owner, officer and director.

30.     In the 2-1/2 years that Bortner has run the company her way and to the exclusion of Resh, 3FX has seen no significant increase in revenues. However, there have been substantial increases in unwarranted overhead expenses.

31.     3FX is no longer being run efficiently or cost effectively.

32.     Prior to Resh having been frozen out of the corporation by Bortner, the fair market value of 3FX was in excess of $2,000,000.

33.     As a result of Bortner's unilateral and poor decisions, self-dealing and mismanagement, the current value of 3FX has likely dropped substantially.

## COUNT I
## BREACH OF FIDUCIARY DUTY

34.     The averments contained in paragraphs 1 through 33 above are incorporated herein by reference as though set forth at length.

35.     Defendant Bortner has maintained control of 3FX to the exclusion of Resh since 2013.

6

36.     By virtue of her control of the corporation, Bortner owes a fiduciary duty to the other shareholder, Resh.

37.     Bortner has breached her fiduciary duty to Resh by freezing him out of the corporation and oppressing his rights as a shareholder of 3FX.

38.     The breaches of fiduciary duty by Bortner and freeze out of has included, *inter alia*, the following:

a.     Bortner has increased her annual salary from $100,000 to $150,000 while decreasing Resh's salary from $100,000 to $25,000.

b.     In 2013, Bortner unilaterally provided three (3) top employees 40% increases in salary.

c.     Bortner scheduled a meeting with a client, Hoffmann La-Roche, in Basil, Switzerland to introduce Gottlieb as the client's new 3FX contact. Bortner brought her husband and young daughter with her on that trip. All four of them flew first class and stayed at an expensive hotel on funds advanced by 3FX. Bortner told Resh that these expenses would be reimbursed to 3FX by the client. However, when the expense report was submitted to the client, it refused reimbursement because the costs were unwarranted and excessive.

d.     Bortner unilaterally agreed to pay Gottlieb a 10% commission of Hoffmann-La Roche projects even though that account pre-dated his hiring.

e.     In 2014, Bortner and Gottlieb hired Debbie Cauterucci as a Sales Representative at an annual salary of $85,000. She lasted only 6 months, during which she obtained only a single, small value project.

7

      f.     Bortner engaged a personal friend, Dawn Sedgwick, as a freelance Project Manager and paid her approximately $20,000 to perform services that could have been done in-house at a greatly reduced cost.

      g.     Bortner hired Vendere Partners as an outside sales company. This decision cost 3FX $33,000, but resulted in no business.

      h.     Bortner used 3FX funds, to pay invoices from her personal attorney who had attempted to negotiate Bortner's buyout of Resh's shares.

      i.     Bortner has used the company Citibank card to buy family groceries, lunches, technology devices, and educational purchases for her daughter.

      j.     In 2015, Bortner had the corporate checking account changed to require her signature only. Resh no longer has access to the corporation's checking account.

      k.     The use of freelancers to assist in projects has increased in 2015, even though 3FX's billings are reduced and the in-house staff is capable of producing the work without outside assistance.

      l.     3FX's travel expenses have increased dramatically beginning in 2014 and much of the travel is unnecessary.

      m.     Resh had always been provided financial reports on a bi-weekly basis when 3FX's bookkeeper was in the office. Following the cancellation of the buyout negotiations by Bortner, she directed that Resh stop being provided those reports. Despite demand, he has not received bi-weekly financial reports since October, 2015.

      n.     Historically, Bortner and Resh would agree upon the appropriate year-end distribution to shareholders by Dec. 31st. However, in 2015 Bortner unilaterally determined that

8

there would be no year-end distribution to the shareholders for the first time in 3FX's history. Effective as of January 1, 2016, she gave herself a substantial pay raise.

      o.    For 2016, Bortner has added $152,000 in additional corporate salary expense.

      p.    Bortner has prepared an operating budget for 2016 which estimates that there will be no profits available for distribution at year's end. To date, 3FX is far behind its budgeted revenue estimates for 2016.

      q.    Resh has not been provided with 3FX's year-end 2015 Financial Statements.

      r.    On the 2015 Federal tax return, Form 1125-E Compensation of Officers, Resh's name was omitted and Bortner is listed as the only corporate officer.

      s.    On or around March 2015, Resh's remote access the company servers was removed.

39.    As a result of said conduct, Resh has suffered and will continue to suffer damages.

40.    As a frozen-out shareholder, Resh is entitled to an award of damages in the amount of the value of his 50% share in 3FX as of the date he was frozen out of the corporation – an amount which exceeds $1 million.

41.    The conduct of Bortner is extreme and outrageous, evidencing a wholesale disregard for Resh's rights, and thereby justifying the imposition of punitive damages.

42.    Pursuant to 15 Pa.C.S. §1981(a)(1) and (2), it being in the best interests of the shareholders of 3FX, the Court should order an involuntary winding up and dissolution of 3FX, Inc. because:

      a.    The conduct of Bortner was oppressive; and

     b.     3FX's assets are being misapplied and/or wasted.

43.     Pursuant to 15 Pa.C.S. §1985, the Court should appoint a liquidating receiver to receive and disburse 3FX's assets in accordance with an orderly plan of involuntary dissolution.

WHEREFORE, Plaintiff Cory A. Resh demands judgment in his favor and against Defendant Jody Bortner in an amount in excess of $75,000, together with punitive damages, interest and costs of suit and respectfully requests this Honorable Court to enter an Order of involuntary dissolution and appointing a liquidating receiver for 3FX, Inc.

Date: May 16, 2016

STANLEY B. CHEIKEN, ESQUIRE

Jenkintown Plaza – Suite 400
101 Greenwood Avenue
Jenkintown, PA 19046
(215) 572-8600

*Attorney for Plaintiff Cory A. Resh*

10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CORY A. RESH, | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | |
| | : | **No. 16-cv-2437(CMR)** |
| v. | : | |
| | : | |
| JODY BORTNER; and | : | |
| 3FX, INC. | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR APPOINTMENT OF A RECEIVER *PENDENTE LITE*

### I.    INTRODUCTION

Plaintiff Cory A. Resh brings this lawsuit against his business partner and co-owner of 3FX, Inc., defendant Jody Bortner. As set forth in the Motion for Appointment of a Receiver *Pendente Lite* and Affidavit of Cory A. Resh, Defendant Bortner has commandeered exclusive control over the financial and business affairs of 3FX, Inc. Bortner has utilized her control of the corporation to squeeze Resh out, thereby preventing Resh from receiving the benefits to which he is entitled as a shareholder of the corporation. Resh seeks the appointment of a receiver *pendent lite* in order to prevent Bortner from dissipating the assets of 3FX, Inc. and in order to preserve it as a viable entity pending the outcome of his claims on the merits.

1

## II.   ARGUMENT

### A.   THE LEGAL STANDARD

The decision whether to appoint a receiver is within the discretion of the Court. *Simms v. Exeter Architectural Products*, 868 F.Supp. 668, 672 (M.D. Pa. 1994); *Stainton v. Tarantino*, 637 F.Supp. 1051, 1072 (E.D.Pa.1986) (quoting *Northampton National Bank of Easton v. Piscanio*, 475 Pa. 57, 63, 379 A.2d 870 (1977)). The appointment of a receiver is a drastic remedy to be exercised by the court with caution "under such circumstances as demand or require summary relief." *Simms*, 868 F.Supp. at 672, *Stainton*, 637 F.Supp. at 1072 (quoting *Hankin v. Hankin*, 507 Pa. 603, 608, 493 A.2d 675 (1985)).

### B.   RESH IS ENTITLED TO THE APPOINTMENT OF A RECEIVER *PENDENTE LITE*

Resh seeks the appointment of a receiver to safeguard the financial condition of 3FX, Inc. until such time as the case can be decided on its merits. This request is specifically authorized under the statutory framework applicable to Pennsylvania corporations, especially in the circumstances presented in this case where one shareholder has been frozen out of the corporation by the other shareholder.

Majority shareholders owe to minority shareholders a fiduciary obligation of the "utmost good faith and loyalty." *Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Pa. 1984), aff'd, 802 F.2d 448 (3d Cir. 1986); see also *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 100-101 (3d Cir. 2001) (A majority shareholder "is under close scrutiny, and is expected to conform to the highest standards of conduct"); *Ferber v. Am. Lamp Corp.*, 503 Pa. 489, 469 A.2d 1046, 1050 (Pa. 1983) ("It has long been recognized that majority shareholders have a duty to protect the interests of the minority"); *Grill v. Aversa*, 908 F. Supp. 2d 573, 591-93 (M.D.Pa.

2

2012). Therefore, a "policy of corporate governance which has as its objective the denial of benefits to the minority interest runs afoul of this fairness standard and calls to question the majority's fulfillment of its fiduciary duty to the other shareholders." *Orchard*, 590 F. Supp. at 1556; see *Ski Roundtop, Inc. v. Hall*, 265 Pa. Super. 266, 401 A.2d 1203, 1209 (Pa.Super. 1979).

This is especially true in a closely-held corporation where shares are not publicly traded and a fair market is rarely available. *Orchard*, at 1557. Accordingly, Pennsylvania courts have held that majority shareholders' duty to the minority "prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." *Ferber*, 469 A.2d at 1050 (Pa. 1983) (quoting *Hornsby v. Lohmeyer*, 364 Pa. 271, 72 A.2d 294, 298 (Pa. 1950)); See also *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099, 1103 (1980). Thus, actions taken by a majority shareholder that benefit her own interests must also be in the best interest of all shareholders and the corporation. *Id.* (citing *Weisbecker v. Hosiery Wide Patents, Inc.*, 356 Pa. 244, 51 A.2d 811, 814, 817 (Pa. 1947)). "Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role." *Bohler-Uddeholm*, 247 F.3d at 100-101; *Grill*, 908 F. Supp. 2d at 591-93.

A majority shareholder may not use the corporate process to deny a minority shareholder the right to participate in the corporation or to "exclude minority shareholders from their proper share of benefits accruing from the enterprise." *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa.Super. 2003); see *Orchard*, 590 F. Supp. at 1556; *Hill v. Ofalt*, 85 A.3d 540, 550 (Pa.Super. 2014).

A "freeze-out" occurs in a closely-held corporation when a minority shareholder is removed from office or his power or compensation is substantially diminished, in an attempt to

3

exclude the shareholder from any meaningful role in the corporation or deny him benefits from the corporation. *Viener*, 834 A.2d at 556 (citing *15 Pa. Cons. Stat. § 1767*). Such an attempt by a majority shareholder to "freeze-out" or "squeeze-out" a minority shareholder constitutes a breach of this fiduciary duty. Tactics employed against a minority shareholder to effect such a "freeze-out" include, but are not limited to: 'generally oppressive conduct, the withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority stockholders, withholding information relating to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholders appraisal rights, failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making.' *Orchard*, at 1557.

Here, Bortner may be anticipated to contend that, because she owns only 50% of the shares of 3FX, Inc., she cannot be deemed a majority shareholder and does not owe a fiduciary obligation to Resh. Under this theory, Bortner's own lawlessness, in commandeering the corporation and ignoring the rights of her 50% co-owner, would be rewarded with impunity from the harm caused by her misconduct. Under the circumstances here presented, where Bortner freely exercises the rights of a majority shareholder, she must be deemed to owe the same fiduciary duty Resh as would a 51% shareholder.

The courts that have considered these circumstances have consistently applied a framework which imposes a fiduciary duty upon non-majority shareholders who use control of the corporation to freeze out another shareholder. For example, in *Liss v. Liss*, 2002 WL 576510 *6 (C.P.Phila. March 22, 2002), the trial court permitted a claim for breach of fiduciary brought by one 50% shareholder against another 50% shareholder to go forward under a majority freeze

out theory. The *Liss* court reasoned that such a claim was cognizable where, just as in this case, a 50% shareholder "allegedly used his control of [the corporation] to 'oppress' [the other 50% shareholder] and exclude him from [corporate] operations." *Liss*, at \*6. (citing *Baron v. Pritzker*, 52 Pa. D. & C.4th 14 \*3 (C.P.Phila. Mar. 6, 2001); *Delaney v. Georgia-Pacific Corp.*, 564 P.2d 277, 281 (Or.1977); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del.Ch.1984); and *ALI Principles* § 1.10(a)(2) and (b) (definition of controlling shareholder).

Where a shareholder has been frozen out of a closely held corporation, a proper measure of damages for breach of fiduciary duty is to place a fair value on the minority shareholder's ownership interest in the closely held corporation before the freeze out. See *Viener*, 834 A.2d at 556-58; *Orchard*, 590 F. Supp. at 1560. Damages are assessed in this amount against the majority shareholder who is determined to have breached his fiduciary duty to the minority by squeezing him out of the closely-held corporation. *Id.*

Here, Resh has asserted a claim for breach of fiduciary duty under the squeeze out approach outlined in *Viener* and *Orchard*. In the trial of his claim on the merits, Resh will seek damages based upon the fair market value of his shares at the time of the freeze out. Nevertheless, Resh is in immediate need of preliminary injunctive relief in order to preserve the financial condition of 3FX, Inc. pending the outcome of the dispute on the merits. As an oppressed shareholder, the law establishes a framework to provide the relief Resh now seeks.

Pursuant to 15 Pa.C.S. § 1767, a court may appoint a custodian for a corporation upon application of a shareholder when:

> In the case of a closely held corporation, the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5 percent or

5

more of the outstanding shares of any class of the corporation in
their capacities as shareholders, directors, officers or employees.

*15 Pa.C.S. § 1767(a)(2).* A closely-held corporation is defined as a corporation with 30 or fewer

shareholders. *15 Pa.C.S. § 1103.* 3FX, Inc. is a closely-held corporation because it has only two

shareholders, Resh and Bortner. Resh owns 50% of the outstanding shares of 3FX, Inc., and he is

a director of the corporation. Thus, under 15 Pa.C.S. §1767, he has standing to request this Court

to appoint of a custodian to protect his rights from the oppressive conduct of Bortner, who has

taken control of the corporation to Resh's exclusion.

Moreover, preliminary relief is entirely appropriate in the context of corporate disputes

such as the instant case. The Business Corporation Law specifically empowers this Court to issue

a preliminary injunction to preserve the status quo and to prevent unlawful and oppressive

conduct by corporate fiduciaries. 15 Pa.C.S. §1984 provides that:

> Upon the filing of an application under this subchapter, the court
> may issue injunctions, appoint a receiver *pendente lite* with such
> powers and duties as the court from time to time may direct and
> proceed as may be requisite to preserve the corporate assets
> wherever situated and to carry on the business of the corporation
> until a full hearing can be had.

15 Pa.C.S. § 1984. Thus, the showing of oppression by Bortner is a sufficient basis for the Court

to appoint a receiver *pendente lite* to safeguard the corporation until the parties' dispute can be

determined on its merits.

Even if the foregoing statutory remedy did not exist, this Court would still have the

power, in equity, to enjoin the shareholder oppression being perpetrated by Bortner. When the

gravamen of a claim focuses upon oppression by a controlling shareholder of a closely held

corporation, equitable relief is traditionally available. *Baron v. Pritzker*, 2001 Pa. Dist. & Cnty.

6

Dec. LEXIS 447 *6; 52 Pa. D. & C.4th 14 (March 6, 2001) See *e.g., Orchard v. Covelli,* 590 F.

Supp. 1548, 1560 (W.D. Pa. 1984), aff'd, 802 F.2d 448 (3d Cir. 1986).

The facts set forth in the instant Petition and Affidavit of Cory A. Resh easily establish

oppressive conduct on the part of Bortner. Oppressive conduct may take the form of "freezing

out" a minority shareholder by removing him from his various offices or by substantially

diminishing his power or compensation. See, *15 Pa.C.S. § 1767,* amended comment. Just a few

examples of the oppressive conduct by Bortner are:

- Excluding Resh from important corporate decisions, such as the hiring and compensation of key personnel, and strategic marketing approaches to business development.

- Removing Resh's regular access to the financial books and records of the corporation.

- Increasing Bortner's salary without the approval of Resh.

- Unilaterally decreasing Resh's salary.

- Failing to make a year-end profit distribution when profits should have been available for distribution to shareholders.

- Using corporate funds for personal expenses and travel.

- Omitting Resh from the listed corporate officers on 3FX's 2015 tax return.

Resh's complaints and admonitions to Bortner have fallen on deaf ears. Regrettably,

Bortner has simply chosen to ignore Resh and to operate 3FX, Inc. as if she were the sole

shareholder. Resh's 50% ownership has been compromised by virtue of Bortner's steadfast and

stubborn refusal to acknowledge his rights as an owner, officer and director of the corporation.

7

**III.**    **CONCLUSION**

For the foregoing reasons, Cory A. Resh is entitled to have a receiver pendent lite appointed to take over the control of 3FX, Inc. pending the outcome of the parties' dispute on the merits.

Respectfully submitted,

Date: May 19, 2016

_____

STANLEY B. CHEIKEN, ESQUIRE

*Attorney for Plaintiff*

8

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused to be served a true and correct copy of the foregoing Petition for Appointment of a Receiver *Pendente Lite* upon the following persons by first-class mail, postage prepaid:

> JODY BORTNER
> 4178 Milords Lane
> Doylestown, PA 18902
>
> 3FX, INC.
> 751 Arbor Way, Suite 110
> Blue Bell, PA 19422

Date: May 19, 2016

/s/ Stanley B. Cheiken, Esquire (SC1060)
STANLEY B. CHEIKEN, ESQUIRE

*Attorney for Plaintiff Cory A. Resh*