IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORY A. RESH,<br><br>     *Plaintiff*,<br><br>  v.<br><br>JODY BORTNER, et al.,<br><br>     *Defendants*. | CIVIL ACTION<br>NO. 16-02437 |

**PAPPERT, J.**                                    November 21, 2016

**MEMORANDUM**

  Cory Resh and Jody Bortner founded 3FX, Inc., a 3D animation studio, in 1995. They each came to own fifty percent of the closely held corporation. In 2013 relations between the two began to deteriorate and Resh now claims that since then, Bortner has effectively excluded Resh from the company's management. Resh disagrees with many of Bortner's decisions and believes that Bortner's actions have decreased the value of 3FX, in turn decreasing the value of Resh's fifty-percent interest in the company. Although Resh primarily alleges injury to 3FX, he sued Bortner directly, alleging that Bortner breached a purported fiduciary duty owed to him by "freezing him out" of the company. Bortner filed a motion for judgment on the pleadings. Bortner first argues that given the substance of Resh's complaint and the relief he seeks, Resh's claim is a derivative, rather than direct, action. In the alternative, Bortner argues that even if Resh has stated a direct claim for breach of fiduciary duty, he has no standing to bring it because equal shareholders in a closely held corporation do not owe each other a fiduciary duty as a matter of law.

Under Pennsylvania corporate law, a shareholder may not sue individually for injuries that result indirectly from injuries to the corporation. To have standing to sue individually, a shareholder must allege a direct, personal injury that is independent of any injury to the corporation. If, on the other hand, the primary wrong alleged is dependent upon and derivative of injury to the corporation, the cause of action belongs to the corporation and must be brought derivatively on behalf of the entity. Here, the gravamen of Resh's complaint is injury to the corporation and its assets as a result of Bortner's alleged mismanagement and waste, which has in turn diminished the value of Resh's share in 3FX. The Court accordingly grants Bortner's motion and judgment is entered in favor of Bortner without prejudice to Resh's right to pursue a shareholder derivative claim in the appropriate forum.

## I.

In 1995 Resh, Bortner and Greg O'Driscoll incorporated 3FX. Each of them owned one-third of the shares of stock and they constituted the sole officers and directors of the corporation. (Pl.'s Compl. ¶ 7, ECF No. 1.) They apparently formed the closely held corporation without a written shareholder agreement since none has been cited by the parties or attached to the pleadings. About a year after 3FX's founding, Resh and Bortner purchased O'Driscoll's shares, pursuant to which they each became fifty-percent shareholders in 3FX, as well as the only officers and directors of the corporation. (*Id.* ¶ 9.) Prior to their falling out, Resh and Bortner co-managed 3FX and sought "consensus about how to proceed in the best interests of the corporation." (*Id.* ¶ 10.) Resh contends that beginning in early 2013, however, Bortner "began to do things her way and often without consulting Resh about important matters affecting the business of 3FX." (*Id.* ¶¶ 16–17.) Bortner claims that she consulted Resh about important matters affecting 3FX in 2013 and thereafter but Resh "frequently told her that he did not want to

be involved in these matters" and "often was out of the office and would not communicate to Bortner where he was at any given time." (Defs.' Answer ¶ 16, ECF No. 7.)

According to Resh, Bortner and Neil Gottlieb conducted meetings without him regarding the company's sales and marketing efforts.[1]  (Pl.'s Compl. ¶ 19.)  Bortner denies refusing to include Resh in such discussions and contends that Resh was made aware of them but "generally chose not to attend." (Defs.' Answer ¶ 19.)  Bortner also points out that Resh was included in sales and marketing discussions because Gottlieb had a recurring weekly sales meeting with Resh. (*Id.* ¶ 21.)  Resh nevertheless asserts that ultimately the "existing strategies that had been implemented by Resh along with another sales representative were dismissed and ignored by Bortner." (Pl.'s Compl. ¶ 19.)  Resh further contends that the other sales representative resigned in July 2013 due to the "lack of respect shown to him by Bortner" and claims that this resulted in a substantial loss of revenue for the business. (Pl.'s Compl. ¶ 20; Defs.' Answer ¶ 20.)

Resh contends that Bortner "began to run 3FX as if she were the majority controlling shareholder of the corporation and Resh were a minority owner whose vote was less valuable than hers." (Pl.'s Compl. ¶ 21.)  According to Bortner, after 3FX hired Gottlieb, Resh "became less engaged in the business of 3FX and began spending less and less time at 3FX's office." (Defs.' Answer ¶ 18.)  Bortner states that Resh was not in the office a total of approximately ninety working days in 2013 and forty-three working days in 2014. (*Id.*)

In late 2013, Resh and Bortner began negotiating a buyout by Bortner of Resh's shares in 3FX because "it was evident that it would be difficult, if not impossible, to repair their working relationship as co-owners of 3FX." (Pl.'s Compl. ¶ 22.)  In March 2015 the parties agreed in

---

[1] Resh alleges that Bortner hired Gottlieb as Vice President of Sales, Marketing and Business Strategy and agreed to dramatically overpay him, all without Resh's input or approval. (Pl.'s Compl. ¶ 17.)  Bortner contends she and Resh both interviewed Gottlieb and agreed to Gottlieb's hiring and compensation structure. (Defs.' Answer ¶ 17.)

principle on a proposed buyout price of $1 million, to be paid over four years. They were unable to agree, however, on the remaining terms of the deal and the proposal was withdrawn in July or August 2015. (Pl.'s Compl. ¶ 25; Defs.' Answer ¶ 25.)

In January 2015, Resh moved to Florida. (Defs.' Answer ¶ 18.) Bortner contends that he has been at 3FX's office less than four times since the January 2015 move. (Defs.' Answer ¶ 18.) In June 2015 Bortner reduced Resh's annual salary from $100,000 to $25,000. (Pl.'s Compl. ¶ 27; Defs.' Answer ¶ 27.) Bortner claims she did so to better reflect the actual services Resh was providing to 3FX. (Defs.' Answer ¶ 27.) Resh claims that, after reducing his salary, Bortner excluded him from all corporate decisions and denied him access to the company's financial records. (Pl.'s Compl. ¶¶ 28–29; Defs.' Answer ¶¶ 28–29.) Bortner, by contrast, denies excluding Resh from any decisions or records and contends that Resh "has continued to disengage himself from 3FX's business and operations, is rarely present at 3FX's office and does little, if any, work on behalf of 3FX from his Florida residence." (Defs.' Answer ¶ 26.)

Resh contends that at the end of 2015 Bortner unilaterally determined that there would be no year-end distribution to the shareholders for the first time in 3FX's history. (Pl.'s Compl. ¶ 38(n).) According to Bortner, she and Resh discussed year-end distributions, but they could not agree on an appropriate amount and, while discussions were ongoing, 3FX's accountant left the corporation. (Defs.' Answer ¶ 38(n).) Bortner contends that she and Resh accordingly agreed to wait to make the distribution until after 3FX obtained a new accountant, since distributions can be made at any time. (*Id.*) Bortner also states that 3FX made a $50,000 distribution to each shareholder in January 2016 after retaining a new accountant and discussing the issue with him. (*Id.*) Finally, Resh notes that Bortner increased her own salary from $100,000 to $150,000 in 2016. (Pl.'s Compl. ¶ 38(a).) Bortner responds that her 2016 salary

increase "is commensurate with her duties and responsibilities as the full-time employee responsible for managing 3FX's day-to-day operations and as its President." (Defs.' Answer ¶ 38(a).)

In support of his claim, Resh cites several business decisions allegedly made by Bortner with which he disagrees and argues that the corporation is "no longer being run efficiently or cost effectively." (Pl.'s Compl. ¶ 31.) Specifically, Resh argues that Bortner breached her purported fiduciary duty to him by, *inter alia*: increasing her salary and lowering his; unilaterally granting "three top employees 40% increases in salary"; using corporate funds to pay for Bortner, her husband and her daughter to travel to Switzerland (where Bortner and Gottlieb met with a client); agreeing to pay Gottlieb a 10% commission on projects for an account that pre-dated his hiring; hiring a sales representative at an annual salary of $85,000 who lasted just six months and obtained only one small value project for the corporation; hiring her personal friend as a freelancer and compensating her $20,000 to perform services that could have been done in-house at a greatly reduced cost; hiring an outside sales company which "cost 3FX $33,000, but resulted in no business"; using corporate funds to pay invoices from her personal attorney who attempted to negotiate Bortner's buyout of Resh's shares; using corporate funds to buy family groceries, lunches, technology devices and educational purchases for her daughter; increasing the use of freelancers in 2015 even though the company's billings were reduced and the in-house staff was capable of producing the work without outside assistance; permitting 3FX's travel expenses to increase dramatically despite much of the travel being unnecessary; withholding Resh's access to the corporate checking account and computer servers; refusing to send him biweekly financial reports or provide him with the 2015 year-end financial report; withholding dividends from Resh by unilaterally determining that there would be no year-end distribution to

shareholders in 2015; preparing a budget for 2016 which estimates that there will be no profits for distribution at year's end; adding $152,000 in additional corporate salary expense for 2016; and omitting Resh's name as a corporate officer on 3FX's 2015 federal tax return.  (Pl.'s Compl. ¶¶ 37–38; Defs.' Answer ¶¶ 37–38.)

In sum, Resh contends that under Bortner's leadership 3FX has seen "no significant increase in revenues" and "substantial increases in unwarranted overhead expenses."  (Pl.'s Compl. ¶ 30.)  Accordingly, while the fair market value of 3FX was in excess of $2,000,000 prior to his exclusion from the company's affairs, the current value of 3FX has "likely dropped substantially" due to Bortner's "unilateral and poor decisions, self-dealing, and mismanagement."  (*Id.* ¶¶ 32–33.)

Notwithstanding Resh's general assertion that Bortner has "oppressed his rights as a shareholder," (*id.* ¶ 37), Resh's substantive allegations focus primarily on the ways in which Bortner's unilateral mismanagement has harmed the corporation and thus, indirectly, his interest in it.  Resh, however, brings a direct action against Bortner rather than a derivative action on behalf of 3FX.  Resh contends that "by virtue of her control of the corporation, Bortner owes a fiduciary duty" to her co-equal shareholder and that Bortner breached that duty by "freezing Resh out of the corporation and oppressing his rights as a shareholder."[2]  (*Id.* ¶¶ 36–37.)  Resh seeks relief in the form of "damages in the amount of the value of his 50% share in 3FX as of the date he was frozen out of the corporation—an amount which exceeds $1 million," punitive damages, attorneys' fees and costs and the involuntary dissolution of 3FX.  (*Id.* ¶¶ 2–3, 40, 43.)

---

[2]   A "freeze-out" occurs in a closely held corporation when a minority shareholder is removed from office or his power or compensation is substantially diminished, in an attempt to exclude the shareholder from any meaningful role in the corporation or deny him benefits from the corporation.  *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. Ct. 2003) (citing 15 Pa. Cons. Stat. § 1767).

**II.**

Pursuant to Federal Rule of Civil Procedure 12(c), judgment on the pleadings will be granted "only if, viewing all the facts in the light most favorable to the nonmoving party, no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3d Cir. 2012); *see also Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The pleadings are closed after an answer is filed, along with a reply to any additional claims asserted in the answer. *Austin Powder Co. v. Knorr Contracting, Inc.*, No. 3:08-1428, 2009 WL 773695, at *1 (M.D. Pa. Mar. 20, 2009).

Where, as here, a motion for judgment on the pleadings asserts that the plaintiff fails to state a claim on which relief can be granted, the court considers the motion under the same standard as a Rule 12(b)(6) motion. *See, e.g.*, *Caprio v. Healthcare Revenue Recovery Grp., LLC*, 709 F.3d 142, 146–47 (3d Cir. 2013); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010) (citing *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991)). "The only notable difference between these two standards is that the court, for a motion on the pleadings, reviews not only the complaint but also the answer and written instruments attached to the pleadings." *Harris v. City of Philadelphia*, No. 15-3689, 2016 WL 1073233, at *1 (E.D. Pa. Mar. 18, 2016) (quoting *Brautigam v. Fraley*, 684 F. Supp. 2d 589, 591–92 (M.D. Pa. 2010)).

**III.**

Under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

7

(2007).  The "mere possibility of misconduct" is not enough.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The Court must construe the complaint in the light most favorable to the plaintiff.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted).  While a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 550 U.S. at 555 (2007) (citations and alterations omitted); *see Iqbal,* 556 U.S. at 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

First, the Court must "take note of the elements the plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face."  *Schuchardt v. President of the United States*, ___ F.3d ____, No. 15-3491, 2016 WL 5799656, at *8 (3d Cir. Oct. 5, 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*  Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

**IV.**

Federal courts sitting in diversity apply the substantive law of the state whose law governs the action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The parties agree that Pennsylvania law governs this dispute. Under Pennsylvania law, it is well-settled that a majority shareholder owes a fiduciary duty to a minority shareholder. *See, e.g.*, *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983); *Weisbecker v. Hosiery Patents*, 51 A.2d 811, 813–14 (Pa. 1947). Since majority shareholders have the power to direct the manner in which the corporation is run, the fiduciary duty prevents them from using their power in such a way as to exclude the minority from their proper share of benefits accruing from the enterprise. *Hornsby v. Lohmeyer*, 72 A.2d 294, 298 (Pa. 1950). The imposition of this fiduciary duty gives minority shareholders standing to bring direct actions against majority shareholders alleging shareholder oppression based on a breach of that duty. Resh asks the Court to predict that the Pennsylvania Supreme Court would expand that reasoning and recognize a fiduciary duty owed by one fifty-percent shareholder to the other if, as Resh contends here, one of the owners assumes control and "freezes out" the other. Bortner contends that no such duty is owed in Pennsylvania as a matter of law and argues that, in any case, the character of the allegations supporting Resh's claim dictate that the claim must be brought as a derivative action. Because the Court concludes that the gravamen of Resh's complaint is harm to 3FX as a result of Bortner's conduct, and redress for that harm must be sought on behalf of the corporation by way of a derivative action, the Court need not determine whether Bortner owes Resh an individual fiduciary duty on the facts of this case.

Under Pennsylvania law, when a shareholder brings suit, the court is to perform an independent inquiry to determine whether the action is direct or derivative in nature. *See Hill v.*

9

*Ofalt*, 85 A.3d 540, 549 (Pa. Super. Feb. 5, 2014); *Kitty Ward Travel, Inc. v. Ward*, 2016 WL 1615795 at *7 (Pa. Super. Ct. Apr. 22, 2016); *Frost v. Zeff*, No. 827, 2015 WL 8552111, at *5 (Pa. Super. Ct. Dec. 11, 2015). In making this determination, the court is to disregard the plaintiff's designation or stated intention and instead independently examine the body of the complaint, the nature of the injury alleged and the relief sought. *See Hill*, 85 A.3d at 549; *Ward*, 2016 WL 1615795, at *7; *see also Grill v. Aversa*, No. 1:12-120, 2014 WL 4672461, at *7 (M.D. Pa. Sept. 18, 2014). Here, the Court must engage in this inquiry irrespective of the parties' disagreement over whether Bortner can be deemed to owe Resh a fiduciary duty under Pennsylvania law—for even where a *minority* shareholder sues a *majority* shareholder for breach of fiduciary duty (and it is undisputed that a duty is owed to the minority shareholder), Pennsylvania courts nevertheless analyze the complaint of a plaintiff shareholder who purports to bring such a claim to determine whether that particular plaintiff's claim, given the nature of the injury alleged and the type of relief sought, is in fact properly characterized as direct rather than derivative.[3] *See Grill*, 2014 WL 4672461, at *7 (analyzing whether the "gist" of minority shareholder's complaint was a direct claim for minority shareholder oppression or a derivative claim for injury to the corporation); *see also Reifsnyder v. Pittsburgh Outdoor Advert. Co.*, 173 A.2d 319, 322 (Pa. 1961) (examining whether the injury plaintiff alleged to his rights as a shareholder was "merely a subterfuge attempting to disguise a harm to the corporation by

---

[3] Resh's argument is that Pennsylvania Supreme Court would adopt the Delaware approach to imposing duties on shareholders in closely held corporations that is not limited to just majority shareholders, but instead allows the imposition of such a duty to be triggered *either* by majority share ownership *or* by actual control over the corporation. Such an approach would thus leave open the possibility that Bortner could owe Resh a fiduciary duty despite their formal status as equal shareholders with equal voting power *if* Resh could show that Bortner exercises the requisite degree of control over the corporation. However, even assuming *arguendo* that Bortner owes such a duty to Resh and that Resh has *standing* to bring a direct claim for breach of fiduciary duty, this would put him in the same position as a minority suing a majority shareholder. The Court would still have to determine whether, as Bortner contends, Resh's claim is more appropriately characterized as derivative given the substance of his allegations. And just as in the cases where minority shareholders are owed a fiduciary duty, he would nevertheless be precluded from bringing his claim directly if, considering the gravamen of the complaint, the Court concluded that Resh's claim was derivative in nature.

alleging a harm in the terms of a direct injury to an individual shareholder"); *Willis v. Dillsburg Grain & Mill. Co.*, 490 F. Supp. 46, 49 (M.D. Pa. 1980) (determining that allegations set forth by minority shareholder to support his breach of fiduciary duty claim actually involved acts properly raised only in support of a derivative action). Put differently, although it is undisputed that a minority shareholder is owed a duty and thus *has standing* to bring a direct claim for breach of fiduciary duty, courts are to analyze such complaints to determine whether, in substance, the plaintiff *has* in fact brought such a claim.

In *Hill*, the Pennsylvania Superior Court outlined the manner in which courts should approach this inquiry:

> Whether a cause of action is individual or derivative must be determined from the nature of the wrong alleged and the relief, if any, that could result if the plaintiff were to prevail.
> In determining the nature of the wrong alleged, the court must look to the body of the complaint, not to the plaintiff's designation or stated intention. The action is derivative if the gravamen[4] of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent dissipation of its assets. . . . If damages to a shareholder result indirectly, as the result of an injury to the corporation, and not directly, the shareholder cannot sue as an individual.

*Id.* at 550. If the court determines that a claim is actually derivative in nature, the plaintiff is precluded from proceeding directly under a shareholder oppression theory.

Looking to the body of Resh's complaint as well as the relief he seeks, the gravamen of Resh's complaint is that he has been injured (at the very most) indirectly as a result of the harm which Bortner purportedly inflicted on 3FX. In fact, Resh never alleges direct financial injury— he conclusorily states he has suffered and will continue to suffer damages. (Pl.'s Compl. ¶ 39.)

---

[4] The Oxford Dictionary defines "gravamen" as "the essence or most serious part of a complaint or accusation." *Gravamen*, https://en.oxforddictionaries.com/definition/gravamen. Some synonyms for "gravamen" listed in the legal dictionary are core, cornerstone, crux, essence, gist and thrust. *Gravamen*, http://legal-dictionary.thefreedictionary.com/gravamen (last visited November 18, 2016).

More importantly, of the factual allegations supporting Bortner's alleged breach of a fiduciary duty to Resh, eleven of the nineteen subsections in the complaint allege that Bortner engaged in poor business decisions that were either too costly or did not result in adequate revenue for the corporation. See (*id.* ¶ 38(b)–(i), (k), (l), (o)). More specifically, the allegations emphasize Bortner's poor judgment in granting excessive or unwarranted increases in salaries to various employees, (*id.* ¶ 38(b), (d), (o)), hiring and overpaying freelancers or outside companies to perform work that could be done in-house at a lower cost, (*id.* ¶ 38(e), (f), (g), (k)), wasting corporate funds on endeavors that produced either no or minimal business for the corporation, (*id.* ¶ 38 (e), (g)), expending excessive corporate funds on unnecessary travel, (*id.* ¶ 38(c), (l)), and misusing corporate funds for her own personal expenses or benefit, (*id.* ¶38(c), (h), (i)). Such allegations of mismanagement and waste or misuse of corporate assets constitute paradigmatic injuries to the corporation itself. See, e.g., *Penn Mont Sec. v. Frucher*, 502 F. Supp. 2d 443, 463 (E.D. Pa. 2007).

      In sum, the majority of Resh's factual allegations concern direct injury to the corporation and its assets as a result of Bortner's alleged poor business decisions. While Resh makes certain allegations that would also be cognizable in a claim based on a theory of shareholder oppression, even viewing those allegations in the light most favorable to Resh, they are still a comparatively small part of his claim. At bottom, the essence of Resh's complaint seems to be that under Bortner's leadership 3FX has seen "no significant increase in revenues" and "substantial increases in unwarranted overhead expenses." (Pl.'s Compl. ¶ 30.) And as a result, while the fair market value of 3FX was in excess of $2,000,000 prior to Resh being frozen out, the current value of 3FX has "likely dropped substantially" due to Bortner's "unilateral and poor decisions, self-dealing, and mismanagement." (Pl.'s Compl. ¶¶ 32–33.) Thus, Resh seeks "an award of

damages in the amount of the value of his 50% share in 3FX as of the date he was frozen out of the corporation—an amount which exceeds $1 million." (Pl.'s Compl. ¶ 40.) Resh seeks compensation for the devaluation of his interest in 3FX resulting from Bortner's alleged mismanagement.

Notwithstanding Resh's stated intention, the gravamen of his complaint is not a direct claim of shareholder oppression in the context of a closely held corporation, but rather is a derivative shareholder claim to be brought on behalf of the corporation. Any allegations of the type that would also be cognizable in a shareholder oppression suit are "merely incidental to" the allegations of corporate injury that "lie at the heart of this lawsuit."[5] *Grill*, 2014 WL 4672461, at *7. The facts alleged therefore do not support a direct action and instead form the basis of a claim that Resh must bring as a shareholder derivative action.[6] The Court thus need not reach the question of whether Bortner could be deemed to owe Resh a fiduciary duty under

---

[5] The court in *Grill* acknowledged that while "the distinction between direct and derivative actions is straightforward in its articulation, it can be more complex in its application since many actions by the majority shareholders in a corporation may result both in direct harm to an individual shareholder, and lead to a broader injury to the corporation itself." *Grill*, 2014 WL 4672461, at *7. Despite recognizing "the substantial overlap that may exist between direct and derivative claims," the court looked at the recurring themes in the plaintiffs' allegations and concluded that "the gist of the plaintiffs' claims" was a direct claim of minority shareholder oppression, as opposed to a broader shareholder derivative claim on behalf of the corporation. *Id.* Here, while the Court acknowledges the small number of overlapping allegations that sound in shareholder oppression and the generalized legal conclusions that Resh was "frozen out" sprinkled throughout the complaint, the relief sought and the recurring themes of mismanagement and waste of assets in relation to Resh's substantive factual allegations lead the Court to conclude that the "gist" of his claim is a derivative claim on behalf of the corporation. *See id.*; *see also In re SemCrude L.P.*, 796 F.3d 310, 318 (3d Cir. 2015) ("[T]he fact that plaintiffs framed the harm as a direct fraud [does] not permit them to go forward on a claim that [i]s, at its core, derivative." (quoting *Arent v. Distribution Scis., Inc.*, 975 F.2d 1370, 1373 (8th Cir. 1992)).

[6] *See, e.g.*, *Arent v. Distribution Scis., Inc.*, 975 F.2d 1370, 1372 (8th Cir. 1992) (district court properly dismissed claims brought directly after finding that they were derivative claims belonging to the corporation); *Minielly v. Acme Cryogenics, Inc.*, No. 15-6164, 2016 WL 1221640, at *8 (E.D. Pa. Mar. 28, 2016) ("Because the claim does not purport to be a derivative action, and the only basis for the claim is [Plaintiff's] status as a shareholder, the claim is not plausible and any attempt to amend would be futile."); *In re Blackrock Mut. Funds Fee Litig.*, No. 04-164, 2006 WL 4683167, at *8 (W.D. Pa. Mar. 29, 2006) (dismissing claims because plaintiff shareholders improperly sued directly rather than derivatively); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 553 (E.D. Pa. 2005) (dismissing plaintiffs' claim for breach of fiduciary duty because it was derivative); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 493 (N.D. Ill. 1999) (dismissing plaintiffs' direct claims for breach of fiduciary duty without prejudice after finding that plaintiffs' injuries were derivative in nature); *Atwood Grain & Supply Co. v. Growmark, Inc.*, 712 F. Supp. 1360, 1364 (N.D. Ill. 1989) (holding that plaintiffs' claims, brought directly, had to be dismissed because they were derivative in nature).

Pennsylvania law despite their status as equal shareholders with equal voting power.  It is unnecessary to attempt to make such a prediction when it would only determine if Resh has standing to bring a direct claim for breach of fiduciary duty.  Resh's standing to do so is irrelevant because, given the nature of his allegations, his claim is clearly one on behalf of the corporation, not himself.

Bortner's motion for judgment on the pleadings is accordingly granted and judgment is entered in favor of Bortner without prejudice to Resh's right to assert a derivative action in an appropriate forum.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.